Thomas J. Freeman, Receiver, v. J. G. Clark.

No. 2360. Decided June 26, 1915.

**Damages—Carrier of Passengers—Humiliation.**

Plaintiff, in an action against a railway for damages for furnishing accommodations and service for passengers insufficient and other than promised by the company's passenger agent, could not recover for humiliation of mind which he suffered because others, his companions whom on the faith of such promise he had induced to select that route, received the same inadequate service. (Pp. 304, 305.)

Certified question from the Court of Civil Appeals, Third District, in an appeal from Hays County.

*Fisher & Fisher* (*Leake & Henry, John M. King* and *T. B. McCormick,* of counsel), for appellant.—There can be no recovery for such mental suffering as merely results from sympathy for another's mental or physical discomfort or pain, the right of action in such cases being restricted to the person who has directly sustained the injury. G. C. & S. F. Ry. Co. v. Overton, 101 Texas, 586; Railway Co. v. Gregory, 73 S. W., 28; Western Union Tel. Co. v. Cooper, 71 Texas, 512; St. Railway Co. v. Reichart, 87 Texas, 539; Watson on Damages and Personal Injuries, sec. 406; Pullman Palace Car Co. v. Trimble, 8 Texas Civ. App., 335, 28 S. W., 96.

*Barber & Johnson,* for appellee.—Where a contract is made to furnish certain accommodations to one and his friends or his relations and the one agreeing to furnish such accommodations necessarily contemplates that as a result of a breach the injury to the beneficiary of the contract would be greater by reason of the presence of those other persons, then he will not be heard to say that such increased injury may not be considered in determining the true damage. Railway Co. v. Coopwood, 96 S. W., 102; Railway v. Anchonda, 68 S. W., 743; same case, 33 Texas Civ. App., 24, 75 S. W., 557; Telegraph Co. v. Richardson, 79 Texas, 649; Telegraph Co. v. Kendzora, 26 S. W., 245.

It is firmly established by our decisions that one may recover for or on account of mental pain sustained by reason of the sufferings of another, provided only same results from breach of a legal duty owing to the complaining party and provided further that same were fairly within contemplation of the parties when the contract was made from which the duty follows: Railway v. Coopwood, 96 S. W., 102; Railway v. Overton, 101 Texas, 582; Railway v. Stogner, 163 S. W., 319; Telegraph Co. v. Coffin, 88 Texas, 94; Telegraph Co. v. Richardson, 79 Texas, 649; Telegraph Co. v. Allen, 146 S. W., 1069; Telegraph Co. v. Garrett, 34 S. W., 649.

Mr. Chief Justice PHILLIPS delivered the opinion of the court.

The certificate of the Honorable Court of Civil Appeals is as follows:

"In this case the Court of Civil Appeals has held that the trial court committed reversible error by instructing the jury as to the measure of damages, and telling them that if they found for the plaintiff, to allow him compensation, not only for the physical and mental suffering which he sustained on account of the defendant's negligence, but also for any humiliation which he may have suffered on account of the fact that his friends, whom he had induced to go with him, were treated in the same manner that he was. The case is now pending in the Court of Civil Appeals on appellee's motion for rehearing, charging that we committed error in the ruling referred to, and that the instruction complained of was properly given. A copy of the opinion of this court is hereto attached, and made a part of this certificate, and it shows the nature of the case and the question certified; and we here set out the plaintiff's testimony, which reads as follows:

" 'I am the plaintiff in this case and have lived here in San Marcos a great number of years. In June of last year the Confederate Reunion was held at Memphis, Tennessee, and I had occasion to go to that reunion. I had been a Confederate soldier and desired to attend the reunion. I first talked with the Missouri, Kansas & Texas Railway Company's agent with reference to going over that line, and had about decided that I would go that route and would ask my friends to go the same way when I received word through my son about May 1, 1909, that I was wanted at the depot of the International & Great Northern Railroad Company here in San Marcos. He told me that Mr. G. A. Rogers, who was the local agent here of the International & Great Northern Railroad Company, and a Mr. Fitch wanted to see me there at the depot. I went then to the depot as requested, and met Mr. W. E. Fitch who was a traveling passenger agent of the St. Louis, Iron Mountain & Southern Railway Company. Mr. Fitch and Mr. Rogers together talked with me and Mr. Fitch stated that the International & Great Northern Railroad Company and the Iron Mountain route were going to put on through excursions to Memphis and he wanted me to assist him in getting parties from the San Marcos section to go over that line. Mr. Rogers, Mr. Fitch and myself all took part in the conversation, but at that time, nothing was said about any through chair cars, nor were any arrangements nor negotiations with reference to the trip completed. Mr. Fitch said that he would see what arrangements he could make and would communicate with Mr. Rogers or with me in a short time. What they then wanted was that I should agree to go over their lines and undertake to induce my friends to go the same way.

" 'After Mr. Fitch left, some little while passed and I heard nothing from him or Mr. Rogers and I went over and talked to the Katy people again about going over their line, and practically perfected arrangements looking to that end. Later and about two or three weeks after Mr. Fitch was first here he came to San Marcos again and they again sent for me and I went to the station and met him and Mr. Rogers and Mr. Garland Tobin, the latter being the traveling passenger agent

of the International & Great Northern Railroad Company, or of the receiver thereof. They said that they had come to figure with me further on going over their lines to the reunion and I told them that I had just about perfected plans to go over the Katy lines. They urged me to change my plans and go over the International & Great Northern and the St. Louis & Iron Mountain & Southern Railways. They told me that if I would do that they would furnish us a chair car, and that we would have the very best service in every way, and insisted that I should agree to go on that line and should urge my friends to go the same way. They were pleasant, agreeable fellows and I finally agreed to do as they requested. They told me to get as many of my friends and acquaintances to go along as I could and authorized me to say to them that we would have a first-class chair car all the way through without change. Mr. Fitch said that he would go along with us and would see to it that we had all the conveniences and the best of service. These conversations were participated in both by Mr. Fitch and Mr. Tobin as well as Mr. Rogers, and they told me that the two lines really worked together and both Fitch and Tobin made that representation and promise to me. After we had talked about the matter Messrs. Fitch and Tobin proposed that they would prepare a circular letter and send to me for me to send out to my friends and acquaintances with reference to the proposed trip. They went away and as I understood, prepared the letter at Austin and sent back to me. In any event, the next day Mr. Rogers delivered to me a large number of circular letters prepared to be signed and sent out by me. I have a copy of the circular letter sent me by them, and which I sent out to my friends and same reads as follows:

" ' "On account of the fast schedule via the International & Great Northern Railroad and the St. Louis, Iron Mountain & Southern Railway, via Texarkana to Memphis, Tennessee, we have decided to use that route to the Confederate Veteran's Reunion. Will leave San Marcos via I. & G. N. 'Fast Mail' 2:59 p. m. Sunday, June 6th, and arrive at Memphis Monday, 4:30 p. m. There will be through Pullman tourist sleepers and chair cars on this train, also dining car service, and if you desire reservations in the sleeper, please write me at once in order that I may secure same for you.

" ' "Trusting that you may be able to make the trip with us and awaiting your reply, I beg to remain, Yours truly,
(Signed) J. G. CLARK."

" 'As stated, Mr. Fitch sent me quite a number of copies of the foregoing letter to be signed by me and I signed them and sent them out to various friends of mine. In addition, I wrote personal letters to those friends and saw a good many of them and talked with them in person. Among others whom I sent the letters to were Mr. J. T. Howard, Mr. J. L. Harris, Mr. W. S. Lewis and a great many others. Quite a number of those whom I had solicited in this way to go over the line of the two defendants did go thereover as requested by me. I explained to

these friends of mine, including those who went along, that we should have a first-class chair car and first-class service through from San Marcos, that Mr. Fitch and Mr. Tobin had promised me this and that I was sure it could be depended on. Acting and relying upon what these representatives of the railroad company had said to me I went to the M. K. & T. people and told them that I had concluded to go over the lines of the defendant companies, and would not go over the Katy. I fully expected the defendants to furnish us the service as they had so emphatically promised and I assured my friends that they would receive such service if they would go with me over the lines of the defendant companies. Neither of the defendants or their agents were to pay me anything for any services in the matter. I was anxious that we should get the best route practicable and wanted all of us to have good accommodations so that we would have a pleasant trip. If it had not been for those promises made me by Messrs. Fitch and Tobin and Mr. Rogers I would have gone over the M. K. & T. Ry. and its connecting lines, and my friends would mostly have gone with me over that other route.

" 'The plan was to leave San Marcos on the afternoon train on June 6th, which reached here about 3 o'clock and we did in fact go on that train. I with the others bought and paid for a first-class round trip ticket over the line of the two defendant companies from San Marcos to Memphis, Tennessee. I expected to see Mr. Fitch aboard the train, as he had promised, when it reached San Marcos, but he was not there. When the train pulled into the station here it was badly crowded and the San Marcos crowd got aboard wherever they could. There were probably 25 or 30 of us in the San Marcos crowd. Those immediately with me when we got aboard went first into a tourist sleeper. The brakeman who assisted us on the car told us to go in there. There were then some vacant seats and we got a place for the ladies to sit, and I then went to hunt the chair car which had been promised. I found only one chair car on the train and every seat in it was taken with some standing up. There was no chair car on that train except one and there was no opportunity for me or my friends with me to get seats thereon, because it was already full. I went back into the sleeping car which we had first gone into and found a seat there. As soon as the conductor came around I asked him about the seats we had been promised in a chair car and he stated that they had only the one chair car and that it was full, but that he thought we would get another car at Austin or Taylor. I had no ticket for the sleeper and most of the others of my crowd were in the same fix. Some of them had bought tickets for the sleeper, but others were not willing to and had not done so. As we were getting up toward Taylor it was getting toward night, and we were notified that we would have to leave the sleeper in which we were sitting as the parties would want their berths put down. We then asked what we should do and just after we left Taylor a brakeman came and said that he would show us into a car in the rear. I don't know whether that car was put on there at Taylor or whether it had been picked up be-

fore we reached there. The brakeman then showed us back to that car, all of us going, except those who had sleeper tickets. That was not a chair car by any means. It was an old car and the worst car I ever saw run for passengers to ride in. I have ridden on trains more or less during my life and never saw as hard a car as that run. It was old and in bad condition every way. The seats were as hard as that floor there, and no more spring to them than that floor. When we reached Valley Junction my attention was attracted and I discovered a large crowd of negroes being loaded into the car in which we then were. I protested against it but it did no good. I do not know how many negroes they put in there, but they filled the car entirely full. They doubled up into every vacant seat and some of them crowded in between the seats and they stood in the aisle and at the ends of the car almost as thick as they could stand. We went on from Valley Junction in that way with the negroes crowded in all around and about us. A little further up the line, I think at Hearne they put some more negroes in. We kicked about it to the conductor and brakeman but they said they could not help it, as the negroes had to ride somewhere, and they had no other coach for them. So far as I could see, they did not put the negroes into any other coach except the one in which I was riding with my friends. The negroes stayed there with us until we got to Palestine, and then all alighted and we went on through to Memphis in that same car. It was in very warm weather in June, and you can imagine better than I can describe the condition in that car with those negroes in there. It was extremely unpleasant and uncomfortable. There was nothing we could do to remedy the situation. We kept all the windows up which helped some. Before reaching Palestine, I continued to complain to the conductor about not having the chair car and told him what we had been promised. He told me that another chair car would be put on at Palestine, and he thought that we would be able to get seats from there on. When we reached Palestine I watched for the other chair car, but the only chair car put on there was one which they switched from the Galveston line and it was loaded up as the one on our train was. I went up into the car and there was no chance at all to get a seat therein. I was in that car a number of times from then on to Memphis, but it was full all the way through and there was no chance for us to get seats therein. I continued to protest to the train men about their failure to furnish us the chair car as promised, or seats in a chair car, but they were unable to do anything for us, as all seats therein were occupied. The result was that we went clear through to Memphis in that old car that we were loaded into at Taylor. In addition to the seats being very uncomfortable there was no closets therein and no water provided therein and for any accommodation of that kind we would always have to hunt in the other cars. It was physically uncomfortable riding in that car. The seats were very hard and became very tiresome before we reached the end of the trip. In addition I was very much worried, humiliated and distressed at the treatment received.

I had at the instance of the defendant's agents procured my friends to go with me over their lines upon the promise that they would have first-class accommodations of every kind with a chair car to ride in and then to be loaded into that car as we were, of course fretted and worried me a great deal. My friends held me responsible for the predicament in which we were placed, and some of them seemed to think that I was standing in with the railroad people and getting paid to induce them to go over their road by holding out promises of first-class service which we did not receive. I regretted the treatment accorded us by the railroad companies very much. When we reached Memphis I saw Mr. Fitch for the first time and then complained to him at his failure to carry out his agreement. He said he had been called away to some other place was the reason that he was not there, but he offered no explanation of why we had not had the chair car service, as promised.

" 'We reached Memphis about 5 o'clock in the afternoon of the day succeeding that on which we left San Marcos. It was about the 18th or 19th of May, 1909, when I had the conversation referred to with Fitch, Tobin and Rogers.'

"Cross-examined:  'To go to Memphis and return, I paid $14.25 for my ticket. It was a through ticket from San Marcos to Memphis and return, and the two companies carried me on that ticket to Memphis. I can not say exactly how many were in my party who did not take sleepers, but I think there were 10 or 12.

" 'After the negroes got in the car I did not see any of the train crew attempting to separate the whites from the blacks. They were so thick in there I do not think they could have been separated. I could not say as to whether or not there was a partition in the car. I do not know whether the rest of the San Marcos crowd that went to Memphis got seats in the chair car or not, but I do not think they did. I know that I did not. I think that after we left San Marcos that maybe one or two of the womenfolks got seats in the chair car. There was one crippled lady, a sister of Mr. Watson and someone gave her a seat. I know that the party with me did not any of them find any seats in the chair car. I tried to get seats for them, but could not do so. The conductor told me that the chair car was crowded and in addition I saw it was my-self. I had enough money to pay for a sleeper, but I did not contract to take a sleeper. There were a good many of my friends with me who were not willing to take sleepers and probably did not have money to do so, and as I had gotten them into it, I was not willing to quit them and stayed with them all the way through. I won't say that Mr. Fitch or the other party promised us a special car for the San Marcos crowd. The way I understood them and the way they stated it was that they would send a chair car here and then of course, if there was not enough here to fill it, then we expected to take in other passengers enough to fill it after leaving here. I do know that they instructed me to promise my friends a chair car in which to ride and that I did make such promise to my friends and that they failed to furnish the chair car as promised.

They did not furnish us a separate car, nor did they furnish seats in any other chair car. It is a fact that when we went aboard at San Marcos we went into the sleeper, but that was because we could not get seats elsewhere, and because the man helping us on told us to go there. Yes, I did sit down on a lady's hat, but she did not threaten to throw me out of the window. I apologized to her and did all that a gentleman could do under the circumstances. We were crowded hurriedly into the tourist sleeper, and I did not notice the hat until I had sat upon it. We got to Memphis the next day and had a pleasant time while there and I left just afterwards and went back to my old home in Mississippi before coming here.

"'I am not a Confederate Veteran, but was in a company of boys organized at home while the war was going on. We were too young for active service but had plenty to do trying to keep things straight at home. My occupation is that of a carpenter and I also prepare and sell powder known as condition powder for horses. There was no particular reason why I helped get up the crowd at San Marcos, except that I wanted the crowd to go together, thinking we would all have a nicer time. It was not understood that I was to receive a free ticket or be paid for the work I did. I did it just simply because I was asked and was willing to do so. I saw Mr. Fitch at Memphis, but he did not offer to pay me anything nor did I ask him to pay me anything for what I had done.'"

In this state of the proof the Court of Civil Appeals has certified the following question to us for decision:

"Did the trial court commit error when it instructed the jury that if the plaintiff recovered, the measure of damages would include compensation for any humiliation which the plaintiff may have suffered on account of the fact that his friends, whom he had induced to go with him, were treated in the same manner that he was?"

Upon the original hearing of the case in the Court of Civil Appeals, after which it certified to us the above question, it held, in an opinion delivered by Chief Justice Key, that this charge was erroneous. We agree with that conclusion and therefore answer the question in the affirmative. Judge Key's opinion presents a very clear and satisfactory discussion of the question, and embodies our own views upon it. It may be found in 177 S. W., 1188.

The test of the question finally is whether mental anguish on the part of the appellee because of the treatment accorded those accompanying him on the trip was such a necessary and natural result of the breach of the contract as that the appellant will be held to have contemplated it in the event of such a breach when the contract was made; and we hold that such could not reasonably have been in contemplation in this case. We quote with approval this portion of Judge Key's opinion:

"As a general rule the law does not allow compensation for mental annoyance and discomfort which result from a breach of a contract. Before recovery can be had upon that score it must be shown that the

mental perturbation was more than ordinary regret or annoyance, and was what is commonly denominated 'mental anguish'; and such mental anguish must be such a necessary and natural result of the breach of contract as that the party breaking it will be held to have contemplated such mental suffering. In this case the plaintiff's friends were not related to him; they were not afflicted, helpless and in his charge; they bought their own tickets and paid for their own transportation, and the only fact in reference to them that could have caused the plaintiff any mental disturbance was the fact that he had induced them to travel that route to Memphis, and had witnessed the fact that they were subjected to the same inconvenience and annoyance that he was. While such state of facts might cause regret with a majority of civilized men, we do not believe it is a matter of common knowledge that all, or even a majority, of such men would, under such circumstances, suffer that degree of mental perturbation denominated mental anguish. . . . To sustain the plaintiff's contention in this case and allow the recovery here claimed would result in enlarging the measure of damages beyond the Coopwood case (G. C. & S. F. Ry. Co. v. Coopwood, 96 S. W., 102), which case, it seems to us, has gone far enough."

The case in our opinion is clearly distinguishable from the Coopwood case. There Miss Coopwood, who was subjected to what may be considered rather harsh treatment at the hands of the railway company's employes, was sick and afflicted and in charge of her mother upon the train, and in view of the relationship it was properly ruled that mental suffering on the part of the mother would naturally have been within the contemplation of the defendant if the daughter was subjected to that character of treatment. We do not hold that a state of case might not be presented which would warrant the recovery of damages for such suffering, occasioned by the treatment at the hands of a defendant, of others sustaining a given relationship to the party seeking the recovery of such damages; but in our opinion such a recovery can not be sustained here.

Associate Justice Hawkins concurs in our answer to the certified question, but upon a different ground. It is his view that the charge was erroneous because on the weight of the evidence in that it assumed that it was within the defendant's contemplation that the plaintiff would suffer mental anguish because of the treatment accorded his friends. He thinks the question should have been left to the jury. A majority of the court are of the opinion that under the statement of the case there was no such question to be submitted to the jury.